PAUL SCHNEIDER,

                              Plaintiff,

       v.                                                OPINION and ORDER

GEORGIA KOSTOHRYZ, ANTHONY HENTZ,                        19-cv-756-jdp
DEBRA TIDQUIST, TAMMY MAASSEN,
and CHRISTOPHER BUESGEN,

                       Defendants.[1]

Plaintiff Paul Schneider, appearing pro se, is a prisoner at Jackson Correctional Institution. Schneider alleges that defendant prison officials failed to properly treat his chronic shoulder pain; he brings claims under Eighth Amendment and Wisconsin-law negligence and medical malpractice theories. Defendants have filed a motion for summary judgment, Dkt. 36. Schneider fails to show that defendants consciously disregarded his shoulder pain, so I will grant defendants' motion for summary judgment on his Eighth Amendment claims. I will relinquish supplemental jurisdiction over most of Schneider's state-law claims and I will dismiss this case.

## PRELIMINARY MATTER

I begin with a preliminary motion filed by Schneider. Dkt. 46. Schneider says that he initially did not receive all of the exhibits defendants attached to their summary judgment motion; defendants' summary judgment materials spanned three envelopes with more than

---

[1] I have amended the caption to reflect the spelling of defendants' names as they appear in defendants' filings.

600 pages of medical records, and it appears that Schneider did not receive at least one of the envelopes. But defendants say that they resubmitted those documents to Schneider and he does not raise the issue in his reply, so I consider the issue to be resolved.

Schneider also has filed a motion to compel discovery, arguing that defendants failed to give him copies of legal authority such as case law that they used to support their summary judgment motion. He asks for an extension of time to file his summary judgment response and for the court to sanction defendants by disregarding the legal authorities they will not provide him. But Schneider followed with a timely filed summary judgment response and supporting materials, so I will deny his motion for extension of time as moot.

As for his motion to compel or for sanctions, I am not aware of any authority suggesting that a party's legal authorities are discoverable, but even if they were, Schneider did not seek to confer with defendants' counsel before filing his motion, as required by Federal Rule of Civil Procedure 37(a)(1). And in any event, these materials were already available to Schneider in the prison law library. Schneider says that he has had limited law library access because of COVID-19 protocols. But it doesn't appear that he has been deprived of access to relevant authorities: to the contrary, his summary judgment response contains well-reasoned argument with dozens of citations to relevant case law about Eighth Amendment medical care cases. And regardless the quality of the parties' submissions, I will apply the relevant law to the facts of this case. I will deny his motion to compel and for sanctions.

The following facts are undisputed except where noted.

Plaintiff Paul Schneider is an inmate housed at Jackson Correctional Institution (JCI). All of the defendants were Department of Corrections employees working at JCI during the events in question. Debra Tidquist was an advanced practice nurse prescriber; defendants also refer to her as a nurse practitioner. Georgia Kostohryz and Anthony Hentz were "nurse clinicians 2." Tammy Maassen is a nurse who acted as the health services manager. Christopher Buesgen was the deputy warden.

Schneider suffers from chronic left shoulder pain stemming from injuries suffered in a 2004 car accident. When Schneider was transferred to JCI in October 2016, he had active prescriptions for amitriptyline 50 mg and meloxicam 15 mg.

On March 10, 2017, defendant Tidquist saw Schneider for his complaints of back pain and left shoulder pain as part of an appointment with the prison's "Chronic Pain Team," which defendants say is "a multidisciplinary team of medical professionals whose purpose is to work together in a holistic approach with chronic pain patients to assist them with improving function and relying less on pain medication." Dkt. 56, at 6–7, ¶ 17. The Chronic Pain Team includes an advanced care provider, a physical therapist, and a nurse.

Defendants say that at the meeting, Schneider requested that his amitriptyline be increased to help him sleep. Schneider agrees that he was having difficulty sleeping but he denies that he asked for an increase in amitriptyline; instead he asked for a different medication, and he notes that at an appointment three months earlier he had stated that amitriptyline wasn't working for him. Defendants say that Schneider said he was able to complete all activities of daily living without difficulty. But the parties agree that Schneider

also reported that he had difficulty raising his left shoulder above his head. And the pain team's report stated that Schneider had reduced range of motion when his shoulder was rotated with his arm raised 90 degrees.

Defendant Tidquist diagnosed Schneider with left "shoulder snapping syndrome"—muscle popping or clicking when moving the arm—and chronic low back pain musculoskeletal in nature. The standard of care for these conditions is conservative management of pain such as physical therapy, a home exercise program, and over-the-counter pain relievers. Schneider says that he received more intensive treatment a decade earlier from a sports medicine clinic, including an ultrasound, trigger-point injections, chiropractic therapies, and prescription medications.

The pain team, led by Tidquist, decided to increase Schneider's amitriptyline to 75 mg daily and discontinue his meloxicam. The team also decided to continue his prescription for acetaminophen 650 mg four times daily as needed, referred him to physical therapy for an evaluation and treatment of his left shoulder and back pain, and said that the team would follow up with him as needed. Schneider says that Tidquist also told him that he would have a follow-up appointment with a doctor about his medications, but that appointment did not occur.

A month later, defendant Tidquist saw Schneider for a complaint of allergy symptoms. At this appointment, he requested to be seen by a physician for chronic pain issues; Tidquist responded either by telling him that a pain team follow-up was already scheduled or by ordering a follow-up appointment.

In the meantime, Schneider started physical therapy, with three visits between April 17 and May 23, 2017. At the final appointment, the therapist discontinued the therapy before

the full number of visits prescribed by defendant Tidquist, concluding that no further visits were necessary. The therapist stated that although Schneider's subjective complaints were unchanged, his functioning was indeed improving, he was able to participate in recreation, including weightlifting, and that he would benefit from a "home exercise program" focused on scapular strengthening.

In late June 2017, defendant Tidquist reviewed the therapist's report and she discontinued the planned pain team follow-up meeting with Schneider, concluding that his level of activity showed that his pain levels were manageable. Defendant Nurse Kostohryz signed off on Tidquist's prescriber's order, acknowledging that Kostohryz had reviewed it and completed the order to discontinue Schneider's chronic pain visit.

Defendant Tidquist and the physical therapist met with Schneider in late September 2017 for his continued complaints of pain. On assessment, Schneider displayed no physical indicators of pain and had fairly good range of motion. Tidquist also noted that Schneider held a job working in the kitchen. Schneider stated he wanted to start Lyrica (pregabalin), but Tidquist explained to Schneider that Lyrica is for neuropathic pain and that currently she did not think that Lyrica would be appropriate for his type of problem, a muscle sprain or strain. Schneider notes that previous providers have at times assessed him with having nerve pain. Tidquist also thought that "Class III" medications like Lyrica and gabapentin were not appropriate for inmates like Schneider with a history of polysubstance abuse, because of a higher potential for abuse.

Defendant Tidquist ordered an electromyography (EMG) test performed on Schneider's neck and shoulder. An EMG is a form of electrodiagnostic testing that is used to study nerve and muscle function. Tidquist wanted to test whether there was damage to his

nerves in the shoulder. Tidquist also ordered a lumbar spine x-ray, increased Schneider's amitriptyline dosage again, renewed his prescription for acetaminophen 650 mg four times daily, and ordered a follow-up meeting.[2]

In early October 2017, an institution complaint examiner recommended dismissing an inmate grievance Schneider filed about health staff failing to address his shoulder pain. The reviewing authority ruled in Schneider's favor, stating that Schneider should be evaluated to determine whether his current treatment plan was still appropriate given his complaints.

Shortly thereafter, defendant Tidquist discontinued her order for a lumbar x-ray and placed an order for a thoracic spine x-ray instead, because Schneider was complaining of pain in his upper back, not lower. The x-ray was completed in mid-October 2017 with results showing a normal thoracic spine. Schneider had the EMG of his neck and shoulder in late October 2017 at Black River Memorial Hospital. The EMG report showed a normal study and concluded that Schneider had no evidence of left upper extremity focal neuropathy, cervical radiculopathy, or brachial plexopathy, meaning his nerve conductions were normal and were not the cause of his pain complaints.

In early November 2017, Schneider wrote a letter to defendant Deputy Warden Buesgen, stating that the pain team was providing him inadequate medical care and delaying to see him. Buesgen called and emailed defendant Health Services Manager Maassen to ensure that Schneider was scheduled to be seen by medical staff. A few days after receiving the letter, Buesgen responded to Schneider, stating that he had recently been seen by a nurse, he had an

---

[2] Schneider refers to this imaging test as an MRI, and his records alternate between calling the order one for an x-ray and one for an MRI. The bulk of the records refer to the test as an x-ray so I will call it that. In any event, a dispute over the precise type of imaging procedure is immaterial to my summary judgment analysis.

upcoming appointment with the pain team (that appears to have been scheduled as a result of Schneider's winning grievance), and that Health Services Unit staff reported to him that Schneider had been refusing his medications.

Shortly after receiving Buesgen's response, Schneider wrote to the warden about the lack of adequate treatment. Heath Services Manager Maassen wrote to the pain team asking about when Schneider would receive his follow-up appointment and she discussed Schneider's treatment with Buesgen. The warden sent Schneider a memorandum stating that Maassen and a nurse from the pain team would meet with Schneider to discuss his letter.

Maassen met with Schneider on December 1, 2017. It's unclear whether a nurse from the pain team was also present. Maassen explained to Schneider the reasons appointments are sometimes rescheduled. Schneider wanted an examination by an off-site provider. Maassen stated that Schneider would next meet with the pain team to determine his plan of care, including whether he needed a referral to an offsite provider. Maassen also said that she could not review specific prescriber's orders but that he could discuss his concerns about those orders with the pain team.

The pain team saw Schneider a few days later. Schneider stated that he wanted to try antidepressant, non-steroidal anti-inflammatory (NSAID), and muscle-relaxant medications. Schneider had stopped taking his prescribed amitriptyline, saying that it wasn't working. The team's notes stated that although Schneider presented with poor posture, hunched forward with head tilted forward, he was not in apparent distress, had no physical indications of pain, and moved his left shoulder with ease. The team reviewed his EMG and x-ray results with him, which were both normal. Defendant Tidquist changed his medications to nortriptyline 25 mg at bedtime and meloxicam 7.5 mg daily. Tidquist states that Schneider told her that the higher

dose of meloxicam he had previously taken caused him heartburn, so Tidquist tried him on a smaller dose. Tidquist also prescribed a transcutaneous electrical nerve stimulator (TENS) unit, and the team advised Schneider to continue physical therapy through a home exercise plan. Schneider says that the prescription for a therapy band he had previously been issued had expired by then, although he does not say that Tidquist was aware of that at the appointment.

Defendant Tidquist also ordered a follow-up meeting in a month, but that meeting was delayed for almost four months. Schneider says that in late March 2018, his prescription for Tylenol ran out. Schneider next met with the pain team in late April 2018. On examination, Schneider was in no apparent distress, had full range of motion with muscle strength rated as five out of five, no redness, and no swelling in his shoulder. Schneider did report pain and tenderness when he was palpated near his scapula. Schneider stated he had stopped taking the nortriptyline because it was not benefitting him. Defendant Tidquist and Schneider discussed that his dosage was low and could have been increased. Schneider also stated that he was not using meloxicam.

Defendant Tidquist discussed a steroid injection as a treatment option and Schneider agreed to proceed. Schneider says that Tidquist did not discuss risks associated with steroid shots and she did not have him signed an "informed consent" form. Schneider also stated that previous cortisone shots had been ineffective and had exacerbated his pain; he says that Tidquist responded that they could use the cortisone shot as a diagnostic tool to rule out inflammation. Tidquist injected Schneider's shoulder with triamcinolone cream, a type of cortisone, along with lidocaine. Tidquist reported that Schneider had no pain about ten minutes after the shot. Schneider denies this, and states that his pain was greatly exacerbated

as a side effect from the shot for about a month. Tidquist renewed Schneider's prescription for Tylenol and advised him to continue his physical therapy exercises.

Around this time, Tidquist was out unexpectedly for more than a month and patient appointments had to be rescheduled. There was only one other advanced care provider at JCI at that time to treat the facility's nearly 1,000 prisoners, and that provider worked at JCI only one day a week. Schneider continued to complain of shoulder pain; from April 2018 to February 2019 he was seen by nursing staff three times and a DOC doctor twice.

For example, on August 25, 2018, Schneider saw defendant Nurse Hentz for his complaints of continued shoulder pain, delay in his treatment, and his Tylenol prescription running out. Hentz noted that Schneider was not in acute distress. Hentz responded that he would schedule him for a doctor appointment, and Hentz issued him a bottle of Tylenol, although he noted that Schneider had enough money in his trust account to purchase over-the-counter medication from the canteen. Nurses cannot prescribe long-term medication themselves. Hentz told Schneider that he would ask the advanced care provider to renew his prescription, which Hentz did; Dr. Martin renewed Schneider's Tylenol prescription for one year. Schneider didn't receive the renewed medication until early September, but there's no indication that this was Hentz's fault.

On August 30, 2018, Schneider submitted an "Interview/Information Request" form, addressed to defendant Health Services Manager Maassen, about the delay in seeing an advanced care provider and about his medication not being refilled. Defendant Hentz responded to the correspondence instead of Maassen. Hentz treated the information form the same way nurses treated health services requests: nurses were encouraged to triage and handle all health service requests. Maassen ordinarily would not see a health service request unless a

nurse forwarded one to her. Hentz responded, stating that he had just seen Schneider for his chronic shoulder pain and had scheduled him for a doctor appointment, then scheduled for September, issued him a bottle of Tylenol, and gotten a doctor to renew his prescription. The September appointment was later delayed. Hentz says that he has no control over whether an advanced care provider reschedules a patient's appointment; the providers have the ability to revise their schedules if they will not be onsite a particular day or if there are other patients that need to be seen first on an emergency basis.

In early October, Schneider filed another information request form addressed to Maassen, stating that he still had not been seen for a follow-up appointment with the pain team and that he believed that he was being lied to about the date of his next appointment. Hentz responded, stating that "[a]ppointments can get moved around for various reasons," and that Schneider was scheduled for an appointment regarding steroid injections that month. Dkt. 47-3, at 585.[3] This appointment was also delayed.

In mid-December 2018, a non-defendant doctor referred Schneider for an offsite orthopedic consultation and she prescribed him ibuprofen. Schneider was seen by physician's assistant Michael Luter in early January 2019. Luter noted Schneider was having "minimal shoulder issues" and "most of his problem is due to his scapular dyskinesia." Dkt. 47-1, at 46. Scapular dyskinesia is a deviation in the normal resting or active position of the scapula during shoulder movement. Luter recommended that Schneider continue working on strengthening and scapular stabilization with physical therapy, Tylenol and naproxen for pain control, and

---

[3] All citations to Schneider's medical record are to the page numbering defendants assign to their Exhibit 1000.

to consider "dry needling," a therapy similar to acupuncture. Along with the offsite appointment, Schneider had an x-ray taken; the image showed a normal left shoulder.

In late January 2019, Schneider filed another information request form addressed to Maassen, stating that his ibuprofen prescription had expired and had not yet been renewed; he stated that DOC policy said that inmates should be seen for medication renewals before they expired. Defendant Nurse Hentz again triaged this correspondence and responded to it instead of Maassen. Hentz stated that ibuprofen was available for purchase at the canteen, that referrals were in place for him to see a JCI doctor and an offsite orthopedist (it's unclear whether Hentz was mistakenly referring to the offsite orthopedic appointment that Schneider had just had), and that Schneider could fill out a slip to be seen directly by a nurse.

Defendant Tidquist saw Schneider again on February 10, 2019. On examination, he was in no apparent distress and had good range of motion. Tidquist did note "grinding" in the affected area, and she identified five trigger points. Schneider agreed to further injections. Tidquist again used cortisone and lidocaine. Tidquist ordered a follow-up for repeat injections in one to two weeks.

Defendant Tidquist followed-up with Schneider a week later. Schneider stated that his shoulder hurt following the last round of injections. Tidquist and Schneider agreed to try a different medication, Toradol, for another round of injections. Toradol is an NSAID drug rather than the previous steroid shots. Schneider tolerated the procedure well.

Schneider met with defendant Tidquist again another week later. Tidquist states that Schneider said that he was feeling better with no discomfort; Schneider disputes this, saying that he said he had minimal relief in his upper left shoulder, still had discomfort below his shoulder blade, and had an increase in "general widespread pain" he was experiencing. Dkt. 49,

at 13, ¶ 86. Tidquist palpated more trigger points, indicating that he still had painful knots, which she injected with Toradol and lidocaine.

At his next appointment, in early March 2019, Schneider stated that he was experiencing more pain after the last injections. Defendant Tidquist and Schneider discussed further treatment options and Schneider agreed to try duloxetine, another antidepressant used to treat chronic pain. At another appointment in late March, Schneider stated that he had fewer knots and less tightness since the trigger point injections. Schneider stated that the duloxetine helped his pain but made him nauseous, caused restless leg symptoms, insomnia, and headache. Schneider agreed to try baclofen, a muscle relaxant used to treat muscle spasms. Because baclofen is a non-formulary medication, it requires approval by the DOC medical director. Tidquist submitted a request that was approved for a three-month trial.

At a mid-May 2019 follow-up appointment, Schneider reported that his spasms and chronic pain had improved using baclofen and he would like to try a larger dose. Tidquist sent another request to the medical director and it was approved.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

A. Eighth Amendment claims

In 2004, Schneider was seriously injured in a car accident and since then he has required medical care for chronic pain management. Schneider contends that defendant prison officials violated his rights under the Eighth Amendment to the United States Constitution by failing to provide him with adequate medical care for his chronic pain.

The Eighth Amendment prohibits prison officials from acting with conscious disregard toward prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A defendant "consciously disregards" an inmate's need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

## 1. Defendant Tidquist

I granted Schneider leave to proceed on Eighth Amendment claims against defendant Nurse Practitioner Tidquist for continuing to prescribe him amitriptyline and meloxicam, medications that Schneider told her had already proven ineffective for his pain; canceling pain-team treatment and justifying it by misrepresenting the physical therapist's conclusions; and giving him cortisone injections despite Schneider warning that previous cortisone injections exacerbated his pain.

A prison medical provider can violate the Eighth Amendment despite providing some care if the provider "persists in a course of treatment known to be ineffective" or a provider's decision is "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Petties v. Carter*, 836 F.3d 722, 729–30 (7th Cir. 2016). But in considering these issues I must consider the totality of care that Schneider received, not just pick apart individual decisions. *Id.* at 728. The Eighth Amendment does not give prisoners the right to demand specific treatment nor does it guarantee successful treatment.

Given the totality of care that Tidquist provided Schneider, no reasonable jury could conclude that she acted with conscious disregard to Schneider's pain. Tidquist initially diagnosed Schneider with left shoulder snapping syndrome and chronic low back pain, maladies that called for conservative methods of pain management. Schneider argues that this contradicted previous diagnoses and treatment decisions made by providers at a sports medicine clinic, but mere disagreement among medical providers' judgments is insufficient to establish conscious disregard, *Berry v. Peterman*, 604 F.3d 435, 442 (7th Cir. 2010), and the sports medicine clinic's treatment was much closer in time to his car accident and of only limited relevance to Tidquist's treatment of his chronic pain condition a decade later.

The medical record shows that Tidquist attempted multiple reasonable ways to treat his pain over the two-year period relevant to the case. She prescribed several types of medication, including amitriptyline, Tylenol, nortriptyline, meloxicam, duloxetine, and baclofen. She also ordered physical therapy, a TENS unit, an EMG, an x-ray, and multiple corticosteroid and Toradol injections. And these were not the only treatments Schneider

received; he also received care from other providers, such as visits with the prison doctor and nursing staff and a consultation with an orthopedic specialist.

Schneider largely takes issue with Tidquist's decisions to continue with medications that previously had not proven effective. But the medications were only one piece of Tidquist's treatment regimen, and Tidquist didn't persist with the exact treatment that had failed in the past—she increased Schneider's dosage of amitriptyline, reintroduced a smaller dose of meloxicam as part of a new combination of medications, and eventually switched the medication for injections from cortisone to Toradol after Schneider continued to complain of pain from the cortisone. It is well established that medical staff are generally entitled to deference when choosing an appropriate pain reliever. *See Williams v. Ortiz*, 937 F.3d 936, 944 (7th Cir. 2019); *Snipes*, 95 F.3d at 592 ("Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations."); *Norwood v. Gosh*, 723 F. App'x 357, 365 (7th Cir. 2018) ("treating pain allows considerable room for professional judgment"). Schneider argues that Tidquist didn't adjust the dosages of amitriptyline or switch the injection medication to Toradol fast enough, but that's a medical malpractice question, not an Eighth Amendment one. Particularly given all the other treatment that Tidquist provided Schneider, no reasonable jury could conclude that she consciously disregarded his pain.

Schneider also contends that Tidquist consciously disregarded his pain by canceling a pain-team appointment in June 2017. But Tidquist did so after reviewing the physical therapist's notes discontinuing the therapy because Schneider was improving, he was able to go to recreation and lift weights, and self-directed therapy exercises were appropriate for him. Tidquist concluded that Schneider was improving and his pain levels were manageable, so he

didn't need additional pain-team meetings. Then, when Schneider continued to complain to pain, his pain-team appointments resumed. This might indicate that Tidquist incorrectly determined that further pain-team meetings were unnecessary, but her actions don't show conscious disregard of Schneider's pain.

Schneider says that Tidquist ordered tests of the incorrect areas of his body—an EMG of his arm and imaging of his neck and lower back—instead of his scapular and thoracic regions, as a "ploy" to falsely state that there was nothing wrong with him. Dkt. 51, at 2, ¶ 10. But the medical records do not support Schneider's theory. His October 2017 EMG was not limited to his arm. The report states that EMG was performed for neck and shoulder pain and the report includes results for muscles in his shoulder. Dkt. 47-1, at 51–52. Tidquist did initially order a lumbar x-ray but changed that to a thoracic spine x-ray after concluding that Schneider was really complaining of pain in his upper back. The records show that Tidquist perhaps initially misdiagnosed Schneider's problem as lumbar pain but she fixed that misdiagnosis and he indeed received a diagnostic test of his shoulder and upper back. A misdiagnosis might be negligent but it doesn't support an Eighth Amendment claim, even more so when it is clear that Tidquist corrected the mistake. And the test results failing to show underlying injury, coupled with assessments by various officials concluding that Schneider did not show signs of distress matching his subjective reports of pain, supported Tidquist's decision to treat his pain conservatively.

Schneider also says that Tidquist's conscious disregard can be shown by multiple delays in treatment, denials of medication refills, or failures to provide him with necessary self-guided therapy resources. I didn't allow Schneider to proceed on claims against Tidquist directly about these issues, but even if I had, Schneider fails to show that Tidquist was aware of these issues

or was responsible for fixing them. And as I stated in denying Schneider leave to proceed about one of the delays in receiving a pain-team appointment, he cannot maintain a claim about delays in treatment where "there is no indication that the delay was caused by [the defendant's] disregard, rather than a bottleneck in available medical appointments, which is common to both prisons and the outside world." Dkt. 9, at 3.

Schneider also argues that Tidquist violated his due process right to decline treatment by failing to follow DOC informed-consent policies about communicating the risks associated with cortisone shots. But I didn't allow him to proceed on a due process claim, and Schneider cannot bring a federal claim solely on the basis that a defendant violated state policies or procedures. *Langston v. Peters*, 100 F.3d 1235, 1238 (7th Cir. 1996) (violation of a prison policy alone does not violate Constitution).

In summary, it is clear that Schneider remained in some amount of pain during his treatment from Tidquist and he believes that Tidquist provided him substandard care. But he is not entitled to mistake-free care under the Eighth Amendment. The fact that Schneider was unable to completely alleviate Schneider's pain might be a question of medical malpractice, or it might reflect the unfortunate reality that not all chronic pain can be eliminated. But Schneider fails to provide evidence that could lead a reasonable jury to conclude that Tidquist consciously disregarded his problems. So I will grant summary judgment to defendants on Schneider's Eighth Amendment claims against Tidquist.

### 2. Defendant Kostohryz

Schneider brings an Eighth Amendment claim against defendant Nurse Kostohryz for canceling his pain-team appointment in June 2017. The undisputed facts show that Kostohryz did not have the authority to discontinue the appointment herself; rather, she reviewed and

completed defendant Tidquist's prescriber order canceling that appointment. Kostohryz says that as a nurse, she defers to advanced care providers' decisions about treatment.

Nurses are generally allowed to defer to doctors' treatment decisions, but there is a limit to this deference; a nurse cannot turn a blind eye to decisions that are clearly harmful to a prisoner. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1075–76 (7th Cir. 2012) (nurse is entitled to rely on doctor's instructions unless it is obvious that doctor's advice will harm prisoner); *Berry*, 604 F.3d at 443 (Nurse's "deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient."). Schneider says that it was obvious that he needed another appointment because he was continuing to say that he was in pain. But Kostohryz was free to defer to Tidquist's assessment of the medical record, particularly the physical therapist notes showing that Schneider's subjective reports of pain did not match providers' observations of his conditions or his own reported activities such as weightlifting, as well as the treatment that Schneider continued to receive, such as his home exercise program and pain-medication prescriptions. Because Schneider fails to produce evidence showing that Kostohryz consciously disregarded his pain, I will grant defendants' motion for summary judgment on his claim against her.

### 3. Defendant Maassen

I granted Schneider leave to proceed on an Eighth Amendment claim against defendant Health Services Manager Maassen for failing to forward complaints about his pain-team treatment to staff who could address them, after she was directed to meet with Schneider in late 2017.

The undisputed facts show that Maassen didn't ignore Schneider's complaints; she referred him for another meeting with the pain team; I take Schneider to be saying that

Maassen consciously disregarded his care by referring him back to the pain team instead of an outside provider, because Schneider's complaints were about how the pain team was mistreating him. But a major focus of his complaints regarding the pain team was about delays in being seen, and Schneider revived prompt treatment from the pain team only a few days later. And the pain team indeed re-evaluated Schneider and changed course; it prescribed new medications along with a TENS unit and home therapy. Additionally, by that point, Schneider had gone offsite to receive further diagnostic tests—an EMG and an x-ray, both of which did not reveal an underlying physical injury. No reasonable jury could conclude from these facts that Maassen consciously disregarded Schneider's health given that her efforts resulted in Schneider receiving a prompt follow up with new treatment options. I will grant defendants' motion for summary judgment on Schneider's claim against Maassen.

### 4. Defendant Hentz

I granted Schneider leave to proceed on Eighth Amendment claims against defendant Nurse Hentz for "intercepting" three complaints he addressed to Health Services Manager Maassen about delays in follow-up appointments and the failure to renew his medications, leading to continued inadequate treatment.

Schneider's medical records show that these were not formal health service requests, but rather "interview/information request" forms. Schneider argues that this means that Hentz should not have responded to requests he addressed to Maassen as the health services manager. I take Hentz to be saying that nurses triage all medical-based requests, whether they are made in a formal health service request or a more informal information request form. But the precise type of form on which Schneider made the requests is irrelevant; there's no constitutional right

to have a complaint addressed by a particular staff member. What matters to the Eighth Amendment analysis is whether Hentz consciously disregarded Schneider's problems.

The undisputed evidence shows that Hentz addressed Schneider's concerns. Schneider's August 30, 2018 request raised concerns similar to those he already raised several days earlier in an in-person meeting with Hentz: he wasn't being seen by the pain team and he had run out of acetaminophen. Hentz explained that he had already given Schneider a bottle of acetaminophen and had forwarded the renewal request to a doctor, which was granted. Hentz also responded to Schneider's complaint about not being seen by the pain team by telling him that he had already scheduled him to be seen by a doctor in September. Schneider says that someone in the Health Services Unit denied another refill request he had made, delaying arrival of the medication by a week, and his medical records show that the doctor appointment set for September was delayed. But Schneider doesn't provide any evidence suggesting that these delays were Hentz's fault.

Hentz also answered Schneider's October 2018 request stating that he still had not been seen by a doctor; Hentz responded that appointments are sometimes moved, and that he was currently scheduled for another steroid injection later in the month. As with the previous request, there's no indication that Hentz had anything to do with the delays in Schneider receiving his next doctor's appointment or injection.

Following appointments with a DOC doctor and an orthopedic specialist, Schneider filed another information request in January 2019, about his ibuprofen prescription not being refilled. Hentz responded that the issue could be addressed at one of his upcoming scheduled appointments and that in the meantime he could purchase ibuprofen from the canteen or he could submit another slip to see a nurse. Schneider says that DOC policy states that

prescriptions should be reviewed by a doctor before they run out, but the failure to do so isn't enough to support a constitutional violation. *See, e.g., Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) ("42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state law or, in this case, departmental regulations and police practices."). And the record shows that Schneider could afford to buy ibuprofen from the canteen.

From Schneider's filings, I infer that he believes that had his complaints gotten to Maassen, she would have arranged for more prompt treatment directly from the pain team or refilled his medications. But there is no evidence suggesting that either Hentz or Maassen could do more than place an appointment on a provider's schedule; they couldn't force a provider to hold the appointment on the day they initially set. And neither Hentz nor Maassen could prescribe medications. Hentz's efforts to schedule Schneider with a doctor show that he did not consciously disregard Schneider's pain. In short, Schneider has failed to provide any evidence suggesting that Maassen would have handled his requests any differently or that Hentz "intercepted" them knowing that Schneider would receive inadequate care as a result. So I will grant defendants' motion for summary judgment on his Eighth Amendment claims against Hentz.

### 5. Defendant Buesgen

I granted Schneider leave to proceed on an Eighth Amendment claim against defendant Deputy Warden Buesgen for failing to respond to his November 2017 letter complaining of inadequate medical care. But the undisputed facts show that Buesgen did respond to Schneider's letter after communicating with Health Services Manager Maassen and confirming that he was scheduled to see the pain team. Schneider argues that Buesgen should have more directly intervened in supervising his care. But this is not what the Eighth Amendment requires.

*See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job."). Buesgen isn't a medical professional and he is entitled to delegate medical treatment to the Health Services Unit. He did intervene after Schneider's complaint to make sure that he would be reassessed by the pain team. No reasonable jury could conclude that Buesgen consciously disregarded Schneider's medical problems. So I will grant defendants' motion for summary judgment on Schneider's Eighth Amendment claim against Buesgen.[4]

## B. State-law claims

I am dismissing all of Schneider's Eighth Amendment claims. That leaves Schneider's parallel state-law medical malpractice or negligence claims against defendants. Schneider has already alleged that he is a Wisconsin citizen so there is no reason to think that the court has diversity jurisdiction over these claims. Ordinarily, this court will decline to exercise supplemental jurisdiction over state-law claims after it dismisses all federal causes of action. *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."). But I will retain jurisdiction over his negligence claim against defendant Buesgen and dismiss that claim because it would be inefficient to leave that claim open for a later state court action. *See Korzen v. Local Union 705*, 75 F.3d 285, 288–89 (7th Cir. 1996) ("The normal practice of course is to relinquish jurisdiction over a supplemental claim when the main claim is dismissed before trial, but if the

---

[4] Defendants also contend that they are entitled to qualified immunity on Schneider's Eighth Amendment claims. Because I am dismissing those claims on the merits, I need not consider defendants' qualified immunity argument.

supplemental claim is easily shown to have no possible merit, dismissing it on the merits is a time saver for everybody.").

Defendants argue that Schneider's negligence claims against the nurse defendants and defendant Buesgen should be dismissed because Schneider failed to comply with Wisconsin's notice-of-claim statute, Wis. Stat. § 893.82. That statute generally requires a claimant bringing a civil action against a state employee to serve written notice of the claim on Wisconsin's attorney general within 120 days of the event giving rise to the action. Section 893.82(3). Schneider concedes that he did not file a notice of claim regarding the incidents at issue in this case.

I will dismiss Schneider's negligence claim against non-medical-employee defendant Buesgen for Schneider's failure to file a notice of claim. But the notice-of-claim statute expressly exempts medical malpractice claims from its requirements. Section 893.82(5m). His negligence claims against the remaining medical-employee defendants are medical malpractice claims; under Wisconsin law, a medical malpractice claim is simply a claim that a medical provider gave negligent care. *See Smith v. Hentz*, No. 15-cv-633, 2018 WL 1400954, at *3 (W.D. Wis. Mar. 19, 2018). I have previously concluded that the notice-of-claim statute did not apply to this type of claim brought against DOC nurses, *Taylor v. Syed*, No. 19-cv-299-jdp, 2020 WL 1939011, at *1 (W.D. Wis. Apr. 22, 2020); *Williams v. Anderson*, No. 17-cv-304-jdp, 2019 WL 6530048, at *6 (W.D. Wis. Dec. 4, 2019). So Schneider's claims against the nurse defendants are not barred by the notice-of-claim statute. I will dismiss Schneider's state-law claims against the nurses and against Nurse Practitioner Tidquist without prejudice; Schneider may refile those medical malpractice claims in state court, subject to the applicable Wisconsin statutes of limitations.

ORDER

IT IS ORDERED that:

1. Plaintiff Paul Schneider's motion for extension of time to file his summary judgment opposition materials, Dkt. 46, is DENIED as moot.

2. Plaintiff's motion to compel discovery and for sanctions, Dkt. 46, is DENIED.

3. Defendants' motion for summary judgment, Dkt. 36, is GRANTED with regard to plaintiff's federal claims and plaintiff's state-law negligence claim against defendant Buesgen.

4. Plaintiff's Wisconsin-law medical malpractice claims against defendants Hentz, Kostohryz, Maassen, and Tidquist are DISMISSED without prejudice under 28 U.S.C. § 1367(c)(3).

5. The clerk of court is directed to enter judgment accordingly and close this case.

Entered July 6, 2021.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge